IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 33032-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ERNEST JAMES SORRELL, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, C.J. — In two recent decisions, the Washington Supreme Court announced a new regime for the imposition and remission of discretionary costs imposed as legal financial obligations on convicted offenders. Beforehand, trial courts routinely and rotely imposed sums of discretionary legal financial obligations and appellate courts spurned review of the awards. In *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), the state high court directed superior courts to conduct an individualized inquiry into the financial circumstances of each offender before levying any discretionary legal financial obligations. The Supreme Court also bestowed discretion on this appeals court to review the superior court's award of the financial obligations regardless of whether the offender objected to their assessment before the superior court. In *City of Richland v. Wakefield*, 186 Wn.2d 596, 380 P.3d 459 (2016),

the state high court instructed lower trial courts to carefully review the pecuniary status of the offender and consider the guidelines in GR 34 when resolving a motion for remission of discretionary legal financial obligations based on manifest hardship.

*Blazina* and *Wakefield* departed from a long-standing jurisprudential view of legal financial obligations as a form of punishment and from an appellate practice of avoiding review of the obligations under the constructs of ripeness and waiver. The two decisions lamented a broken financial obligations system that disables an offender from successfully returning to society. Based on *Blazina* and *Wakefield*, financial obligations must no longer behave as an obsessed and possessed Police Inspector Javert shadowing the offender for the rest of his or her life.

Today, we must apply principles and guidelines from the two Supreme Court landmark decisions when determining whether the trial court erred when failing to directly address Ernest Sorrell's motion for remission of financial obligations and when convicting him of intractably refusing to pay the obligations. In fairness to the trial court, the Supreme Court had yet to decide *Blazina* or *Wakefield* when it issued its decisions. We reverse and remand for a new hearing.

FACTS

In 2009, a Douglas County jury found Ernest Sorrell guilty of two counts of third degree child molestation as a result of sexually abusing his early teen daughter. Based on an offender score of nine plus, the sentencing court imposed sixty months'

2

confinement for both counts, with the counts to run concurrently. In an August 10, 2009 judgment and sentence, the trial court also imposed $3,747.25 in legal financial obligations. The discrete obligations included a $500.00 victim assessment fee, $200.00 for the criminal case filing fee, $747.25 for witness costs, $250.00 for the jury demand fee, $450.00 for transcription costs, $1,000.00 for the cost of a court appointed attorney, a $500.00 fine resulting from a purported violation of the controlled substance act, and a $100.00 deoxyribonucleic acid (DNA) collection fee. The sentencing court entered a boilerplate finding that Sorrell had the ability or the likely future ability to pay the levied legal financial obligations.

The August 2009 judgment and sentence ordered Ernest Sorrell to pay the legal financial obligations at the rate of $25.00 per month beginning immediately. Consistent with all other judgment and sentences, Sorrell's sentence imposed interest at the rate of twelve percent per annum on the financial obligations. Therefore, interest in the annual amount of $449.67 and the monthly amount of $37.47 accrued on the $3,747.25 in financial obligations. Payment at $25.00 per month would never retire the principal owed.

The 2009 judgment and sentence directed Ernest Sorrell to report to the clerk of the court any financial information requested. The judgment and sentence placed Sorrell on monetary supervision until he paid all legal financial obligations, ordered Sorrell to notify the clerk within two days of any change in his address, phone number or

employer's name, and bade him to report to the superior court collections officer and to appear before any financial review hearings.

Ernest Sorrell challenged his judgment and sentence. On July 14, 2011, this court reversed and dismissed one of the child molestation convictions on double jeopardy grounds, and this court remanded for resentencing. On May 7, 2012, the sentencing court, on remand, imposed an exceptional sentence of sixty months for the remaining conviction. The sentencing court also imposed the same amount of legal financial obligations. In essence, the judgment and sentence did not change.

Ernest Sorrell appealed again by challenging his exceptional sentence. On November 22, 2012, and before this court entertained the merits of Sorrell's second appeal, the State Department of Corrections (DOC) released Sorrell from prison. This appeals court, therefore, granted the State's motion to dismiss the appeal as moot. This court added $2,169.35 in appellate costs to Sorrell's financial obligations, despite dismissal on mootness rather than on the merits.

Because of Ernest Sorrell's release from prison on November 22, 2012, DOC filed a closure report on December 18, 2012. The report stated that Sorrell had paid $89.10 toward the $3,747.25 in legal financial obligations earlier imposed by the sentencing court. Sorrell's last payment, on October 4, 2012, amounted to the sum of two cents. With accrued interest of $1,388.73, Sorrell owed, on November 22, 2012, the total sum of $5,046.88, not including the costs imposed by this appeals court. The DOC

closure report omitted any reference to appellate court costs. The closure report declared

that the Douglas County clerk assumed the responsibility for collecting legal financial

obligations.

On December 24, 2012, the sentencing court confirmed and decreed the transfer

of Ernest Sorrell's legal financial obligations collection from DOC to the Douglas

County Superior Court. The transfer order assessed $100 in collection costs on Ernest

Sorrell. The order read, in part:

> NOTICE: The defendant is ordered to contact the Financial
> Collections Officer for Douglas County Superior Court within seven (7)
> days of the date of this order by calling (509) 745-8529 ext. 5 or Direct
> line and voicemail 509-888-6433. Failure to contact the Financial
> Collections Officer as ordered will result in the issuance of an Order to
> Show Cause for your appearance in Court. Failure to appear at any court
> ordered hearing could result in the issuance of an arrest warrant.
> Failure to make payments and notify of any change of address
> could result in the filing of a probation violation and imposition of up to
> sixty (60) days in jail per violation.

Clerk's Papers (CP) at 92 (boldface omitted).

Tristen Worthen, financial collections officer for Douglas County, scheduled a

financial review hearing for Ernest Sorrell's case for June 3, 2013. Sorrell had not paid

any legal financial obligations since his release from prison a half year earlier. He then

owed $7,706, which presumably included costs imposed on appeal. Worthen scheduled

the hearing because Sorrell failed to respond to her request to verify job searches.

Ernest Sorrell, without legal counsel, attended the June 3, 2013 financial review hearing. During the hearing, financial officer Tristen Worthen acknowledged that Sorrell had contacted her by monthly e-mail and that Sorrell's unemployment prevented him from paying. The sentencing court asked Sorrell to predict when he might obtain employment. Sorrell could render no prognostication.

During the June 3 hearing, Ernest Sorrell orally motioned the court to dismiss all financial obligations. Sorrell disavowed any future ability to pay. He mentioned the difficulty in obtaining employment when employment applications required him to disclose any convictions for a crime and the nature of any crimes. Sorrell specifically uttered and the trial court responded:

> DEFENDANT: —have any idea. I'm trying, Your Honor. I'd move the Court to dismiss the fines because I . . . The way things are standing, I don't see any future ability to pay.
> THE COURT: Well, what we're going to do at this particular time, Mr. Sorrell, is we're going to continue this for about three months—

Report of Proceedings (RP) (June 3, 2013) at 4-5. The sentencing court did not directly address Sorrell's motion and continued the hearing three months. The court directed Sorrell to monthly notify the county financial officer of his job search efforts. During the following eighteen months and during four additional review hearings, neither Sorrell nor the trial court mentioned Sorrell's motion for remission of legal financial obligations.

6

On September 9, 2013, Ernest Sorrell appeared again without counsel for a

financial review hearing. Sorrell announced to the sentencing court that, in July, he

gained employment cleaning portable toilets for thirty hours a week. The distasteful

occupation was the only work he could find. He mentioned that he moved to Toppenish,

the locus of the employment. Sorrell added that child support garnished half of his

wages. According to Sorrell, after the garnishment, he received only a couple hundred

dollars to pay rent, utilities, and food. He borrowed money for travel expenses to

Waterville for the financial review hearing.

During the September 9 hearing and after Ernest Sorrell described his

circumstances, the following colloquy occurred between Sorrell, the State's attorney,

and the sentencing court:

> THE COURT: Alright. So when can we start making some payments and how much can we make?
> DEFENDANT: Well, I, I can't really say that, Your Honor. I have about three years left on this child support with them taking half my wages, and until then I, I really can't say—
> THE COURT: Well, I don't understand how child support takes half your wages. Why don't you go get it modified?
> DEFENDANT: I've attempted to that; several occasions.
> . . . I actually had it—
> . . . .
> DEFENDANT: — stopped while I was in prison, and then as soon as I got out all the back support caught up to it.
> THE COURT: How much—
> DEFENDANT: I've attempted to have it completely wiped out because it's not a duty owed to the State, it's owed to Mrs.—my ex.
> THE COURT: Okay. Well, we're going to have to have some payments sometime, so tell me what you can make and when.

DEFENDANT: (no audible response)

THE COURT: Start you with $10.00?

DEFENDANT: I, I just don't see having that. I have to eat; I have to be able to go to work. I, I'm . . . I'm going under as it is. I . . .

THE COURT: Mr. Biggar [State's Attorney]? Ms. Worthen?

MS. WORTHEN: His balance is $7,706.00—

. . . .

MR. BIGGAR: How much is your rent?

DEFENDANT: My rent is 475.

MR. BIGGAR: And how much do you bring home a month?

DEFENDANT: In the last two months I have brought home $1,500.00, $1,586.00. I made—

. . . .

MR. BIGGAR: How much does support take?

DEFENDANT: Support is taking 200—or taking $500.00 a month.

MR. BIGGAR: $500.00 a month?

DEFENDANT: More than my rent.

MR. BIGGAR: So that's . . . If my math is correct, that leaves you about 550 after rent and support for everything else.

DEFENDANT: For two months.

. . . .

THE COURT: I think the 1,500 was for two months.

MR. BIGGAR: Oh, for two months.

DEFENDANT: Yes.

THE COURT: So you average about 750 a month?

DEFENDANT: I, I'm left with about 650 a month, and I still have auto insurance, food—

THE COURT: Alright. Mr. Sorrell, you know, sooner or later we're going to have to start getting some payments, but why don't we knock this over 'til December sometime, see how he's doing then?

MR. BIGGAR: I'm fine with that, Your Honor. The problem for Mr. Sorrell is, of course, interest is accruing, but . . .

. . . .

MS. WORTHEN: His principal is $5,827.50 and his interest is approximately 1,819.

THE COURT: Alright. There's some rules, Mr. Sorrell, that I can do with interest, but you have to start making payments, they have to be consistent and all of those kinds of things, so let's get you on your feet and, and do what you can to start making some payments.

. . . .

THE COURT: Alright. See you back here January 6th.

RP (Sept. 9, 2013) at 8-13 (alterations in original).

On January 6, 2014, Ernest Sorrell appeared without counsel for his third

financial review hearing. Sorrell disclosed that he still worked in Toppenish but had not

paid any legal financial obligations because of limited work hours. He explained that his

job cleaning portable toilets revolved around agricultural work, so he worked few hours

in the winter months. Sorrell fretted that a lawsuit brought to require public release of

sexual offender information could lead to his loss of the job. Sorrell brought a paystub

to the hearing, which stub showed a net income of $4,582.63 since July 2013, which

amount averaged $917.00 per month. He reiterated that he rented an apartment at

$475.00 per month. Sorrell claimed his mother paid for some of his groceries. He

mentioned a struggle to keep from receiving welfare payments. Sorrell suggested folly

behind his receiving welfare payments in order to pay financial obligations to the State.

At the conclusion of the January 6 hearing, the sentencing court continued the

case until April 7, 2014. We have no record of whether a hearing transpired on April 7.

An e-mail typed by Ernest Sorrell referenced another financial review hearing on July 7.

In an August 7, 2014 e-mail message from Ernest Sorrell to Tristen Worthen,

Sorrell declared:

> My name is Ernest Sorrell, I have appeared in court on several
> occasions, [t]he most recent on July 7, 2014.

9

I make the same amount now that I did at the previous 5 hearings. With no change in income, and continually rising cost of living (fuel, healthcare, food) and Child Support Enforcement garnishing my wages, I am left in debt frequently, and forced to rely on "help" with food. I qualify for food stamps, but I feel that putting an additional burden on the State to support me is not in anybody's best interest. . . . I hope it won[']t be necessary to waste more fuel and more money to drive to Waterville to tell you there has been no change, when my circumstances improve the Douglas County Superior Court will be the first to know.
Thank you for your time and patience in this matter.

CP at 97. Worthen replied on August 8, 2014, by stating:

Please provide me with a financial statement of exactly what is received and paid out on a monthly basis. This statement needs to arrive prior to 8/15/2014. I have attached a financial affidavit for your convenience.

CP at 97.

On August 20, 2014, Ernest Sorrell responded by e-mail message to Tristen

Worthen:

RCW 9.94A.760(13) gives county clerks access to Employment Security records for the purpose of wage and employment information. No where in the RCW you stated (9.94A.760) does it require me to give evidence against myself. (5th amendment).
RCW 9.94B.040 clearly indicates "The state has the burden of showing noncompliance by a preponderance of the evidence."
. . . .
There is no willful failure to pay on my part, only an inability. [A]t previous hearings the court has inquired as to my income and monthly living expenses. These are part of the record. There has not been a "willful violation" previously, and my circumstances have not changed. Because the court has not previously found a willful violation and there is no change in circumstance it would be inconsistent for the court to rule a willful violation occurred now. I feel that another summons to appear will gain nothing but to waste the court[']s time and my fuel. Having me

10

arrested for being unable to pay will surely cost me my job, and my future ability to gain employment will be almost non-existent.

The information you seek I have already provided in open court (without the required assistance of counsel).  If you failed to document the information, it is not my fault and I should not be forced to appear to answer the same questions with the same answers over and over again because you weren't paying attention.

CP at 98.

PROCEDURE

On September 11, 2014, the State of Washington filed a motion for an order requiring Ernest Sorrell to show cause as to why he should not be punished for failure to pay legal financial obligations as ordered in his 2009 judgment and sentence.  The motion alleged Sorrell then owed $8,406.07 in financial obligations.  Tristen Worthen signed a declaration in support of the motion to show cause.  The declaration noted that Worthen gained information from the state Employment Security Department that showed Sorrell to make on average $1,390.19 per month.  We do not know if the $1,390.19 constituted gross or net income.  At an arraignment on October 14, 2014, the trial court appointed counsel to represent Ernest Sorrell on the charges that he willfully failed to pay legal financial obligations.

During a contested hearing on December 8, 2014, Ernest Sorrell testified to his financial circumstances.  He mentioned that, before the charges of sexual molestation of a child, he worked installing fire safety systems at $6,000 per month.  He explained that he needs bonding to perform this form of work and he can no longer obtain the bonding

because of his conviction. He has since sought employment in the fast food industry and in landscaping, but employers will not hire him because he may be near children.

During the December 8 hearing, Ernest Sorrell again described the only employment available to him and his recurring expenses. Sorrell worked for his uncle blowing feces and matted toilet paper from portable toilets. He could not deliver or retrieve the toilets from customers because of his conviction. His uncle paid him $13 per hour. Sorrell averaged twenty to thirty hours per week leaving him with a monthly net salary of approximately $1,000. A garnishment took money from his paycheck. A portion of his testimony suggested that child support is taken from the $1,000, but another portion of his testimony suggested that he received $1,000 after payment of support and taxes. Sorrell did not know the amount taken for child support. He was in arrears about $14,000 in support payments. Sorrell also owed fines to Grant County.

According to Ernest Sorrell, he paid rent of $475 per month for his one bedroom apartment. Utilities cost from $50 to $150 a month depending on the season. He paid car insurance of $50 per month. Sorrell also paid for food, gas, and all other expenses of daily living. Sorrell indicated he suffers from Crohn's disease, which randomly prevents him from working. The disease causes vomiting, defecation of blood, and cold sweats. Sorrell lacks medical insurance and recently paid $1,000 in medical bills.

During the December 8 hearing, Ernest Sorrell further averred that he could not currently pay any amount toward legal financial obligations. Sorrell explained that he

wishes to forgo state assistance and the payment of legal financial obligations would require such assistance. He added that, during each trip from Toppenish to Waterville and back, he collects cans on the side of the highway to procure gas money for the trips in order to avoid missing the review hearings and incurring jail time. Sorrell volunteered to perform community service to avoid jail time and earn money toward his financial obligations. Nevertheless, he questioned his ability to perform community service because of his conviction for molestation.

The State of Washington requested that the sentencing court impose ten days of jail time for nonpayment and $50 in attorney's fees. The State argued that Ernest Sorrell could "scrape up a few dollars a month to send to this Court." RP (Dec. 8, 2014) at 28. The State also asserted that Sorrell should not have limited his collecting cans on the side of the road for the purpose of gas money for court travel, but that he should have constantly performed this task to raise money for his financial obligations.

The sentencing court followed the State's recommendation and ordered ten days in jail and imposed $50 in attorney's fees. The court recognized that Ernest Sorrell encountered financial difficulties. Nevertheless, four hundred people in Douglas County, including some with similar convictions, paid financial obligations. The trial court mentioned that Sorrell might work thinning apples, picking apples, or pruning trees. The court concluded that Sorrell had the ability to pay, but chose otherwise. The court held the jail time in abeyance until a review hearing in March 2015. This appeal

further stayed the sentencing court's order.

LAW AND ANALYSIS

*Issue 1: Whether this court should review Ernest Sorrell's assignment that the trial court committed error by refusing to address his request for remission of legal financial obligations?*

*Answer 1: Yes.*

Before answering the first issue, we review Washington's system of financial obligations imposed on a convicted felon. Also, because our dissenting brother questions whether we should review Ernest Sorrell's motion for remission, we extensively support our decision to afford review.

The Washington code includes a maze of statutes, found in various titles, that creates a scheme of legal financial obligations assessed against an offender. This appeal centers around four such statutes: RCW 10.01.160 that addresses the assessment and remission of legal financial obligations, in the form of court costs, not mandatory fines, by the superior court; RCW 10.73.160, which entails appellate costs imposed on losing criminal appellants and remission of those costs; RCW 9.94A.760, which comprehensively covers the imposition, administration, and collection of all costs, fees, fines and restitution ordered on conviction; and RCW 9.94B.040 that imposes penalties for a contumacious failure to pay costs imposed by the superior court and Court of Appeals. RCW 10.73.160(4) and RCW 10.01.160(4), the subsections on remission, are

14

nearly identical in language and are identical in meaning. *State v. Shirts*, 195 Wn. App. 849, 854 n.4, 381 P.3d 1223 (2016). We attach the relevant sections of these statutes in an appendix. We will later quote portions of the statutes during our analysis.

Under these four statutes and Washington's system of legal financial obligations, the superior court, upon a conviction, may order the defendant to pay restitution, costs, fines, and other assessments labeled as legal financial obligations. RCW 9.94A.760(1). The financial obligations may include restitution to the crime victims, the cost of incarceration, the cost of medical care during incarceration, a crime penalty or victim assessment fee, a crime laboratory fee, the State's criminal case filing fee, a DNA collection fee, a domestic violence assessment, the cost of a public defender, and a sheriff's service fee, among other costs. RCW 7.68.035; RCW 9.94A.760(2); RCW 10.01.160; RCW 10.99.080; RCW 36.18.020(2)(h); RCW 43.43.7541. From the date of judgment, legal financial obligations bear interest at a rate of twelve percent per annum. RCW 10.82.090; RCW 4.56.110(4); RCW 19.52.020(1).

On the order imposing legal financial obligations, the trial court should impose a monthly payment required to retire the financial obligations, with payments being applied first to restitution. RCW 9.94A.760(1). The requirement that the offender pay a monthly sum toward a legal financial obligation constitutes a condition or requirement of a sentence, and the offender faces penalties for noncompliance. RCW 9.94A.760(10). To assist in collecting the financial obligations, the trial court may order a payroll

deduction from the defendant's wages to pay for the obligations. RCW 9.94A.760(3).

The judgment for financial obligations may also be enforced as a civil judgment. RCW

9.94A.760(4). The State may add collection fees to the sum of the financial obligations.

RCW 36.18.16(29); RCW 9.94A.780(7); RCW 9.94A.760. The trial court retains

jurisdiction over the offender until the defendant completely satisfies the financial

obligations, regardless of the statutory maximum for the crime. RCW 9.94A.760(4).

The law distinguishes between discretionary and mandatory legal financial

obligations. RCW 7.68.035, RCW 36.18.020(2)(h), and RCW 43.43.7541 respectively

mandate that the court impose a $500 victim assessment fee, a $200 criminal case filing

fee, and a $100 DNA collection fee regardless of the defendant's ability to pay. Trial

courts must impose such fees regardless of a defendant's indigency. *State v. Lundy*, 176

Wn. App. 96, 102, 308 P.3d 755 (2013). Other legal financial obligations imposed by

the trial court, besides restitution, are discretionary.

By statute, the court is not authorized to order a defendant to pay discretionary

fees unless the defendant possesses or will possess the financial ability to pay. RCW

10.01.160(3) reads:

> The court shall not order a defendant to pay costs unless the
> defendant is or will be able to pay them. In determining the amount and
> method of payment of costs, the court shall take account of the financial
> resources of the defendant and the nature of the burden that payment of
> costs will impose.

In recent years, the imposition of legal financial obligations by the trial court upon a criminal conviction has gained extensive press coverage, criticism by civil rights groups, critiques by legal commentators, challenges by appellants, and differing rulings by divisions of the Washington Court of Appeals. Many trial courts formerly routinely imposed discretionary financial obligations no matter the financial status of the defendant because RCW 10.01.160(3) encouraged imposition "unless the defendant is or will be able to pay them." The statutory language implies that the trial court should consider the future ability of the defendant to pay, and no court can predict the future. After all, the defendant might win the lottery tomorrow or inherit from her rich aunt next week.

Many criminal appellants assigned error to the superior court's assessment of legal financial obligations without having complained about the imposition of obligations by the trial court. When the defendant failed to object before the superior court, this court formerly refused to entertain the assignment of error on appeal for various reasons. The defendant purportedly tactically omitted an objection with the hope that the trial court would consider him or her financially responsible and a productive member of society. *State v. Duncan*, 180 Wn. App. 245, 253, 327 P.3d 699 (2014), *rev'd in part*, 185 Wn.2d 430, 374 P.3d 83 (2016). A challenge to financial obligations did not mature until the State began collection efforts. *State v. Mahone*, 98 Wn. App. 342, 348, 989 P.2d 583 (1999). An indigent defendant held the option to seek

17

remission from the trial court at any time. *State v. Smits*, 152 Wn. App. 514, 522, 216 P.3d 1097 (2009).

Under *State v. Blazina*, 182 Wn.2d 827 (2015), the trial court now holds an obligation to conduct an individualized inquiry into the ability of the offender to pay discretionary legal financial obligations. No longer may the superior court impose discretionary costs based on an inability to foresee the future. RCW 10.01.160(3) requires the trial court "do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." *State v. Blazina*, 182 Wn.2d at 838. Rather, the "record must reflect that the trial court made an individualized inquiry into the defendant's current and future ability to pay." *State v. Blazina*, 182 Wn.2d at 838. This inquiry includes evaluating a defendant's financial resources, incarceration, and other debts, including restitution. Our record does not disclose whether the sentencing court conducted a customized questioning of Ernest Sorrell before imposing discretionary obligations.

The Washington Supreme Court, in *State v. Blazina*, observed ills associated with legal financial obligations imposed against indigent defendants. The harms include increased difficulty in reentering society, the doubtful recoupment of money by the government, and inequities in administration. Problematic consequences of automatic imposition of legal financial obligations entail accrual of interest at a rate of twelve percent and accumulation of collection fees when a defendant fails to timely pay

18

obligations. The Washington State Minority and Justice Commission reported in 2008

that a person who pays $25 per month toward his or her legal financial obligations will

typically owe the state more ten years after conviction than when the trial court assessed

the obligations. KATHERINE A. BECKETT, ALEXES M. HARRIS & HEATHER EVANS,

WASH. STATE MINORITY & JUSTICE COMMISSION, THE ASSESSMENT AND

CONSEQUENCES OF LEGAL FINANCIAL OBLIGATIONS IN WASHINGTON STATE 22 (2008)

(Wash. State Minority & Justice Commission), http://www.courts.wa.gov/committee

/pdf/2008LFO_report.pdf. The trial court's lengthy involvement in collecting

obligations inhibits reentry of the offender to society regardless of whether the State

actively seeks to collect the judgment. Legal or background checks will show an active

criminal record in superior court for individuals who have not fully paid their financial

obligations. The active record impairs the defendant's access to employment, housing,

and credit. Reentry obstacles increase the chances of recidivism. The requirement that

the offender pay a monthly sum toward a legal financial obligation constitutes a

condition or requirement of a sentence and the offender is subject to the penalties for

noncompliance as provided in RCW 9.94B.040, RCW 9.94A.737, or RCW 9.94A.740

pursuant to RCW 9.94A.760(10). The sentencing court continuously monitors the

offender and often requires court attendance at hearings to disclose his or her financial

condition with the attendant disruption in the offender's schedule. Low collection rates

of legal financial obligations call into question the utility of collection actions. Counties

with smaller populations impose higher legal financial obligations penalties than other counties.

Statutory remission operates as an avenue for avoiding negative consequences of legal financial obligations. Ernest Sorrell seeks review of the trial court's denial of, if not refusal to address, his motion for remission brought under RCW 10.01.160(4) and presumably RCW 10.73.160(4). The first sentence of each statutory subsection permits a defendant to petition the superior court for remission of his legal financial obligations at any time so long as the defendant is not in "contumacious default." *State v. Shirts*, 195 Wn. App. at 859 (2016).

Previously, this court, in *State v. Mahone*, 98 Wn. App. at 348 (1999), refused review of a motion for remission on the theory that the movant is not an aggrieved party under RAP 3.1 until the State seeks to enforce the legal financial obligations. RAP 3.1 only permits an "aggrieved" person the right to appeal. The *Mahone* ruling ignored the collateral consequences of an order imposing financial obligations. The State, in *Mahone*, also contended that review by the Court of Appeals was not ripe, since Sylvester Mahone could, under RCW 10.73.160(4), file a motion for remission "at any time." Presumably the State fathomed Mahone periodically or continuously filing motions, an act that would try the patience of the judicial system. The State's argument could have prevented any and all review by the appellate courts of denials of motions for remission. In *State v. Smits*, 152 Wn. App. at 523 (2009), this court adopted the

20

argument that a denial of a motion for remission was not appealable since the offender could repeatedly file the motion.

In *State v. Shirts*, 195 Wn. App. 849 (2016), this court, based on *State v. Blazina*, questioned the validity of *State v. Mahone* and addressed the merits of the trial court's denial of Jason Shirts' motions seeking remission of legal financial obligations while Shirts remained in jail. The State argued that Shirts was not an aggrieved party since the State had yet to seek collection of the legal financial obligations. In *Blazina*, the state Supreme Court rejected the State's argument that the proper time for a defendant to challenge the imposition of legal financial obligations is when the State seeks to collect. In *Shirts*, this court considered Jason Shirts to be aggrieved for purposes of RAP 3.1. The *Shirts* court held that the trial court erred when refusing to address his motion for remission on the basis that the State had yet sought to enforce the legal financial obligations. Jason Shirts provided evidence that DOC denied him access to transitional classes and classification advances in prison. Obviously denying an offender transitional classes obstructs the offender's chances of employment on release. The *Shirts* court did not mention the contrary ruling in *State v. Smits*.

Ernest Sorrell assigns error to the trial court's failure to address his oral motion for remission uttered during the financial review hearing on June 3, 2013. He claims the trial court ignored his motion. The State concedes that Ernest Sorrell brought a motion for remission. The State argues instead that the sentencing court denied the request.

21

We question whether the Ernest Sorrell's trial court considered his motion for remission. The court never expressly addressed the motion. The trial court asked Sorrell about his employment opportunities, and Sorrell responded that he could not predict when he might obtain a job and mentioned the difficulty of a sexual offender gaining employment. The trial court inquired no further as to Sorrell's financial condition and instead postponed the review hearing for three months. The sentencing court never later mentioned any pending motion for remission. The trial court never analyzed or issued a ruling as to whether payment of the legal financial obligations would cause "manifest hardship."

We request that a sentencing court conduct a thorough review of the offender's financial circumstances and apply a "manifest hardship" standard when the offender seeks remission. Nevertheless, we agree with the State that other express rulings by the trial court confirm that the trial court would have denied the motion if Sorrell continued to press the motion. Therefore, we proceed as if the trial court denied Sorrell's remission motion. The State does not argue on appeal that this court should refuse entertaining Sorrell's assignment of error that the trial court wrongfully ignored or denied his motion.

The State also does not argue on appeal that Ernest Sorrell failed to timely appeal the trial court's refusal to entertain the motion for remission on June 3, 2013. Nor does the State contend that the denial of the motion is not ripe for review.

22

When the superior court held Ernest Sorrell in contempt, the denial or disregarding of the motion for remission transformed into serious consequences to Sorrell. By then, the State had sought to collect the legal financial obligations. Sorrell therefore gained status as an aggrieved party even under *State v. Mahone* such that he became entitled to appeal as a matter of right. An adjudication of contempt is a final determination of the rights of the parties to the proceedings in that the ruling determines the contumacy of, and affords a basis for, a coercive remedy thereby establishing a right to an appeal. *Arnold v. National Union of Marine Cooks & Stewards Association*, 41 Wn.2d 22, 27, 246 P.2d 1107 (1952).

*Issue 2: Whether the trial court should have granted Ernest Sorrell's motion for remission?*

*Answer 2: We do not answer whether the trial court erred when denying the motion. Nevertheless, we remand for a hearing on the merits.*

We now address the merits of Ernest Sorrell's motion for remission. Under RCW 10.01.160(4), an offender who has been ordered to pay legal financial obligations and who is not in "contumacious default" may petition for remission of costs "at any time." RCW 10.01.160(4); *State v. Shirts*, 195 Wn. App. at 858-59 (2016). If the offender has not contumaciously defaulted, the trial court must determine whether the court's imposition of financial obligations has created a "manifest hardship." RCW 10.01.160(4); *City of Richland v. Wakefield*, 186 Wn.2d at 605-06 (2016); *State v.*

23

*Wilson*, 198 Wn. App. 632, 636, 393 P.3d 892 (2017). If payment will impose manifest hardship on the defendant or the defendant's immediate family, the court "may" remit all or part of the amount due or modify the method of payment under RCW 10.01.170. RCW 10.73.160(4); *State v. Blank*, 131 Wn.2d 230, 235, 930 P.2d 1213 (1997).

We note again the distinction between mandatory and discretionary legal financial obligations. Mandatory legal financial obligations are not "costs" under RCW 10.01.160(1) and (2), and, therefore, the mandatory obligations are not subject to a motion to remit under RCW 10.01.160(4). *State v. Shirts*, 195 Wn. App. at 859 n.7. The August 10, 2009 judgment against Ernest Sorrell levied $3,747.25 in legal financial obligations. This sum included the routine $800.00 in mandatory obligations of a $500.00 victim assessment fee, a $200.00 for the criminal case filing fee, and a $100.00 DNA collection fee. Any motion for remission could not remove the $800.00 in mandatory obligations. We do not address whether an offender may obtain remission of interest owed on mandatory legal financial obligations, since Ernest Sorrell has not raised this issue.

Webster's defines "contumacious" as "perverse in resisting authority" and "stubbornly disobedient." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 497 (1969); *State v. Shirts*, 195 Wn. App. at 859 n.8. The trial court never expressly determined if Ernest Sorrell was in contumacious default.

Ernest Sorrell's first financial review hearing occurred on June 3, 2013, when he

24

moved for remission. At that time, Sorrell was unemployed. The financial officer present at the hearing reported that Sorrell kept in contact by monthly e-mail and disclosed his lack of employment and inability to pay. Sorrell explained to the court how his status as a convicted sex offender rendered his search for employment difficult and to date impossible. Under these undisputed facts, Sorrell was not in willful default. The State did not argue to the contrary then. Therefore, Sorrell was entitled to motion for relief pursuant to RCW 10.01.160(4). The trial court erred, on June 3, 2013, by failing to consider Ernest Sorrell's request and conduct the "manifest hardship" test required by law. Therefore, we remand for the superior court to determine whether Sorrell met the test and whether the court should have exercised its discretion to remit the financial obligations on such date. In *City of Richland v. Wakefield*, 186 Wn.2d at 605-06, our Supreme Court noted the typical remedy, when the trial court commits reversible error by not recognizing or applying the correct "manifest hardship" analysis, is a remand for the trial court to apply the proper standard.

Neither party has briefed whether the superior court should now measure manifest hardship as of June 3, 2013 or the date of the remand hearing. Both parties should address this issue with the superior court.

The term "manifest hardship" is undefined in RCW 10.01.160(4). *City of Richland v. Wakefield*, 186 Wn.2d at 606 (2016). One's present inability to provide for one's own basic needs, food, shelter, basic medical expenses, would meet that standard,

however. *City of Richland v. Wakefield*, 186 Wn.2d at 606. Possessing some ability to pay does not necessarily preclude payment from creating a "manifest hardship." *City of Richland v. Wakefield*, 186 Wn.2d at 605-06. In determining manifest hardship, the trial court should use GR 34 as a guide. *City of Richland v. Wakefield*, 186 Wn.2d at 606. GR 34 is a court rule designed to simplify the process for determining whether a person is indigent for purposes of court and clerk's fees and charges in civil cases. *City of Richland v. Wakefield*, 186 Wn.2d at 606-07. Under GR 34, courts must find a person indigent if his or her household income falls below 125 percent of the federal poverty guideline. *City of Richland v. Wakefield*, 186 Wn.2d at 607. If someone meets the GR 34 standard for indigency, courts should seriously question that person's ability to pay financial obligations. *State v. Blazina*, 182 Wn.2d at 839 (2015); *City of Richland v. Wakefield*, 186 Wn.2d at 607.

To repeat, RCW 10.01.160(4) reads, in part:

> If it appears to the satisfaction of the court that payment of the *amount due will impose manifest hardship* on the defendant or the defendant's immediate family, the court *may remit* all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170.

(Emphasis added.) We note the statute's employment of the word "may." The legislature's use of the term "may" generally indicates the existence of an option that is a matter of discretion. *Whatcom County v. Western Washington Growth Management Hearings Board*, 186 Wn.2d 648, 694, 381 P.3d 1 (2016). If the superior court becomes

26

satisfied that the offender shows "manifest hardship," the court holds discretion to "remit all or part of the amount due in costs." *State v. Shirts*, 195 Wn. App. at 859-60. Therefore, the granting of remission may not automatically follow from a finding of hardship.

Discretion is not unlimited, and the superior court should posit a sound reason if it denies the motion for remission. The trial court abuses its discretion when its exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons. *King County v. Vinci Construction Grands Projects/Parsons RCI/Frontier-Kemper, JV*, 188 Wn.2d 618, 632, 398 P.3d 1093 (2017); *Allard v. First Interstate Bank of Washington, NA*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989).

In *City of Richland v. Wakefield*, 186 Wn.2d 596 (2016), the Supreme Court ordered that the trial court remit Briana Wakefield's discretionary legal financial obligations. The trial court had ordered Briana Wakefield to pay $15 each month toward her outstanding legal financial obligations. Unlike Ernest Sorrell, Wakefield was homeless, disabled, and indigent. Her only income was $710 in social security disability payments each month, and, as a result, she struggled to meet her own basic needs. The city of Richland agreed that Wakefield suffered manifest hardship and asked the Supreme Court to reverse the trial court. The high court also noted that Wakefield's only income was social security and, under federal law, no creditor could reach that income. Regardless the court noted that Wakefield had no present or future ability to

27

pay legal financial obligations and she struggled to obtain basic needs such as secure housing, food, and medical care. The high court observed that having some ability to pay does not necessarily preclude payment from creating a manifest hardship. *City of Richland v. Wakefield*, 186 Wn.2d at 605.

Our gleaning of *State v. Blazina* and *City of Richland v. Wakefield* informs us that the superior court should not exercise its discretion by denying remission on the following grounds. The trial court should not use legal financial obligations as a form of punishment. The trial court should not deny remission on the basis that others in a similar situation may pay his or her obligations. The trial court should, at a minimum, waive interest owed if the amount the offender can pay retires no principal.

We also conclude that the offender's ability to pay a nominal amount should not preclude a finding of manifest hardship. Otherwise, remission would never be available and RCW 10.01.160(4) would be rendered meaningless. Everyone has some ability to pay. Ernest Sorrell could pay a penny a month, a dollar a month, or maybe even five dollars a month. He once paid the sum of two cents. Nevertheless, nominal payments create conditions under which the offender endlessly remains within the legal financial obligation system. The offender constantly suffers from the collateral consequences of the judgment, including frequent returns to court.

Upon remand, we direct the trial court to carefully review whether Ernest Sorrell struggles to obtain basic needs such as housing, food and medical care and whether his

28

income deceeds 125 percent of the federal poverty level. If his income falls below this factor of the poverty level, the trial court must seriously consider remission.

Someone may worry that Ernest Sorrell might win the lottery tomorrow and that remission of financial obligations does not recognize this possibility. Nevertheless, the state Supreme Court rejected a similar argument in *State v. Blazina*. The State had argued that no one knows what might lie in the defendant's future, such that discretionary legal financial obligations should always be imposed. The law does not commit to speculation. If we wish to speculate, we could also speculate that Ernest Sorrell will incur substantial medical bills for which he cannot pay. Actually, such a large unaffordable debt may be more of a probability than speculation.

We blame Ernest Sorrell in part for the trial court's refusal to remit legal financial obligations. At one review hearing, Sorrell provided a paystub, but he otherwise brought no financial records. When testifying at the show cause hearing and when arguing his cause in earlier hearings, Sorrell sometimes spoke in generalities. He never fully accounted for all of his expenditures. He provided confusing testimony as to the amount of child support payments and provided no written confirmation of the payments. Although he testified under oath to his income and expenses, he never completed a financial form.

RCW 9.94A.760(5) and (7) requires the defendant to provide information and documentation to DOC and later the court clerk. RCW 9.94A.760(7)(b) declares in part:

> During the period of repayment, the county clerk may require the offender to report to the clerk for the purpose of reviewing the appropriateness of the collection schedule for the legal financial obligation. During this reporting, the offender is required under oath to respond truthfully and honestly to all questions concerning earning capabilities and the location and nature of all property or financial assets. The offender shall bring all documents requested by the county clerk in order to prepare the collection schedule.

On remand, Ernest Sorrell must provide the court a full accounting for his income and expenses.

*Issue 3: Whether the trial court committed error when holding Ernest Sorrell in contempt for nonpayment of legal financial obligations?*

*Answer 3: We do not directly address this question. Instead, in light of* State v. Blazina, City of Richland v. Wakefield, *and our opinion, we remand the case for a new hearing.*

Remanding Ernest Sorrell's appeal request for remission does not end our inquiry. Even if the trial court remits all discretionary legal financial obligations, the trial court remains able to punish Sorrell, under RCW 9.94A.760 and RCW 9.94B.040, for nonpayment of the mandatory legal financial obligations. The same considerations that apply in favor of remission of discretionary legal financial obligations also pertain to remission of mandatory legal financial obligations. The law, however, does not authorize the courts to cancel the mandatory obligations.

To repeat, RCW 9.94B.040 declares in relevant part:

> (1) If an offender violates any condition or requirement of a sentence, the court may modify its order of judgment and sentence and impose further punishment in accordance with this section.
> . . . .
> (c) The state has the burden of showing noncompliance by a preponderance of the evidence.  If the court finds that the violation has occurred, it may order the offender to be confined . . . .

The pertinent provisions of RCW 10.01.180 read as follows:

> (1) A defendant sentenced to pay a fine or costs who defaults in the payment thereof or of any installment is in contempt of court as provided in chapter 7.21 RCW.  The court may issue a warrant of arrest for his or her appearance.
> . . . .
> (3) If a term of imprisonment for contempt for nonpayment of a fine or costs is ordered, the term of imprisonment shall be set forth in the commitment order, and shall not exceed one day for each twenty-five dollars of the fine or costs, thirty days if the fine or assessment of costs was imposed upon conviction of a violation or misdemeanor, or one year in any other case, whichever is the shorter period.  A person committed for nonpayment of a fine or costs shall be given credit toward payment for each day of imprisonment at the rate specified in the commitment order.

The court may order a noncomplying offender to be confined for not more than sixty days for each violation.  RCW 9.94B.040(3)(c); *State v. Woodward*, 116 Wn. App. 697, 702, 67 P.3d 530 (2003).  Sanctions imposed under RCW 9.94B.040 are criminal sanctions added to the original sentence.  *State v. Nason*, 168 Wn.2d 936, 947, 233 P.3d 848 (2010).

RCW 9.94B.040 does not expressly permit punishment only if the trial court finds a willful violation of failure to pay legal financial obligations.  Nevertheless, due process mandates that the trial court find a failure to pay legal financial obligations to be

willful before imposing sanctions. *State v. Stone*, 165 Wn. App. 796, 816-17, 268 P.3d 226 (2012). Due process precludes the jailing of an offender for failure to pay a fine if the offender's failure to pay was due to his or her indigence. *Bearden v. Georgia*, 461 U.S. 660, 667-68, 103 S. Ct. 2064, 76 L. Ed. 2d 221 (1983); *State v. Stone*, 165 Wn. App. at 817.

In a noncompliance proceeding, the State bears the burden of proving a defendant's noncompliance with sentencing conditions, such as nonpayment of legal financial obligations. RCW 9.94B.040; *State v. Peterson*, 69 Wn. App. 143, 146, 847 P.2d 538 (1993). If the State proves the defendant's failure to comply, the burden shifts to the defendant to show a lack of willfulness. *State v. Woodward*, 116 Wn. App. at 702 (2003); *State v. Peterson*, 69 Wn. App. at 146.

When a defendant claims indigency, he or she must do more than simply plead poverty in general terms. *State v. Woodward*, 116 Wn. App. at 704; *State v. Bower*, 64 Wn. App. 227, 233, 823 P.2d 1171 (1992).

> He should be prepared to show the court his actual income, his reasonable living expenses, his efforts, if any, to find steady employment, his efforts, if any, to acquire resources from which to pay his court ordered obligations, and, . . . [if relevant] . . . any lawful excuse he might have for his failure to report for community supervision.

*State v. Woodward*, 116 Wn. App. at 704 (alterations in original) (quoting *State v. Bower*, 64 Wn. App. at 233).

In *State v. Woodward*, 116 Wn. App. 697, this court affirmed the trial court's denial of a motion for remission. We characterized John Woodward's finances as "murky." *State v. Woodward*, 116 Wn. App. at 704. Woodward submitted no financial affidavits. At his review hearing, he stated his income consisted of $340 a month from government assistance. Woodward alleged paying $175 in rent, more than $75 in electricity, utilities, and food each month. He also claimed that emphysema prevented him from working. Testimony showed he had approximately $90 a month left after other expenses. The trial court reasoned that, certainly Woodward is impoverished, but he could likely afford to pay something, "even if it's five bucks a month." *State v. Woodward*, 116 Wn. App. at 705. In upholding the trial court's determination that nonpayment was willful, this court found the record to support the trial court's assessments that Woodward had the ability to pay something, yet chose not to.

We conclude that *State v. Woodward* does not survive scrutiny under the Supreme Court's decisions in *State v. Blazina* and *City of Richland v. Wakefield*. We wonder how someone, even in 2003, could live on $340 per month. The amount would fall below the poverty level. *Wakefield*'s and *Blazina*'s teaching questions the utility of compelling someone to pay $5 a month or some other nominal amount when the legal system incurs expenses in continued efforts to enforce the financial obligations and when the payments do little, if anything, to retire principal owed. One wonders how much money an offender can make retrieving cans on the side of the road and how the

money from such efforts advances the criminal justice system other than to persistently punish an offender for wrongdoing.

Washington's legal financial obligations scheme illustrates the continual tension in the criminal law between retribution and rehabilitation, justice and mercy. Ernest Sorrell committed a horrendous crime that constituted a grave breach of trust with his daughter. In human terms, the crime is unforgettable and unforgiveable. On the one hand, Sorrell's labor as an unskilled worker cleaning scat from portable toilets serves poetic justice. On the other hand, Sorrell served his jail time and the justice system need not follow and monitor his financial condition the rest of his life. A humane justice system seeks to afford the offender a fresh start in becoming a contributing, if not successful, member of society on release from prison.

The Washington Supreme Court has directed superior courts to "use GR 34 as a guide for determining whether someone has an ability to pay costs." *City of Richland v. Wakefield*, 186 Wn.2d at 606. Although *Wakefield* involved a motion for remission, the overlapping considerations behind a motion for remission and behind contempt proceedings for nonpayment of financial obligations compels the direction that the trial court also employ GR 34 when addressing a motion for contempt. Under GR 34 guidelines, John Woodward would likely have been found indigent due to his reliance on government assistance.

We remand this appeal to the superior court to conduct another hearing to determine if Ernest Sorrell, in light of his difficult financial circumstances and in accordance with GR 34, willfully refused to pay mandatory legal financial obligations and any discretionary legal financial obligations that survive a remission hearing. When the trial court applies the wrong legal standard, the appropriate remedy is a remand. *City of Richland v. Wakefield*, 186 Wn.2d at 606. The trial court may exercise discretion in determining whether to conduct one hearing, in which it entertains the motion for remission and the motion for contempt, or to hold separate hearings.

Ernest Sorrell volunteered to perform community service to avoid jail time and earn money toward his financial obligations. RCW 9.94B.040(3)(c) permits the court to substitute community service as a means of the avoidance of jail time. In the event the trial court, on remand, holds Sorrell in contempt, the court should consider community service, assuming such service is available to a sex offender.

Contrary to the dissenting opinion we do not reverse and remand the contempt ruling solely because of the failure to hold a remission hearing. We would remand for a new hearing even if Ernest Sorrell had not moved for remission.

Ernest Sorrell raises constitutional challenges to the trial court's imposition of a sentence for his failure to pay legal financial obligations. He contends the due process clause demands that the State prove he possesses the ability to pay, rather than his carrying the burden of showing a lack of contumacious failure to pay. He argues that

No. 33032-0-III
*State v. Sorrell*

RCW 9.94B.040 is unconstitutional because the statute lacks any guidance for equitably determining whether nonpayment results from willfulness or the result of indigency. Because we remand for further hearings, we elect not to address these constitutional challenges. Sorrell may raise his constitutional concerns with the superior court during the new hearings and on any additional appeal to this reviewing court.

## CONCLUSION

We remand this case to the superior court for the purpose of conducting a hearing on Ernest Sorrell's motion for remission. We also reverse the conviction for nonpayment of legal financial obligations and remand for a new hearing on the motion for contempt. Both hearings should be conducted and decided in light of *State v. Blazina, City of Richland v. Wakefield*, and this opinion.

Fearing, C.J.

I concur.

Lawrence-Berrey, J.

36

APPENDIX

RCW 10.01.160

(1) The court may require a defendant to pay costs.  Costs may be imposed only upon a convicted defendant. . . .

(2) Costs shall be limited to expenses specially incurred by the state in prosecuting the defendant. . . .  Expenses incurred for serving of warrants for failure to appear and jury fees under RCW 10.46.190 may be included in costs the court may require a defendant to pay. . . .  In no case may the court require the offender to pay more than one hundred dollars per day for the cost of incarceration.  Payment of other court-ordered financial obligations, including all legal financial obligations and costs of supervision take precedence over the payment of the cost of incarceration ordered by the court. . . .  Costs imposed constitute a judgment against a defendant and survive a dismissal of the underlying action against the defendant. . . .

(3) The court shall not order a defendant to pay costs unless the defendant is or will be able to pay them.  In determining the amount and method of payment of costs, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of costs will impose.

(4) A defendant who has been ordered to pay costs and who is *not in contumacious default* in the payment thereof *may at any time petition the sentencing court for remission* of the payment of costs or of any unpaid portion thereof.  If it appears to the satisfaction of the court that payment of the *amount due will impose manifest hardship* on the defendant or the defendant's immediate family, the court *may remit* all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170.

. . . .

RCW 10.73.160

(1) The court of appeals, supreme court, and superior courts may require an adult offender convicted of an offense to pay appellate costs.

(2) Appellate costs are limited to expenses specifically incurred by the state in prosecuting or defending an appeal or collateral attack from a criminal conviction. . . Expenses incurred for producing a verbatim report of proceedings and clerk's papers may be included in costs the court may require a convicted defendant to pay.

(3) . . . An award of costs shall become part of the trial court judgment and sentence.

(4) A defendant who has been sentenced to pay costs and who is not in contumacious default in the payment may at any time petition the court that sentenced the defendant or juvenile offender for remission of the payment of costs or of any unpaid portion. If it appears to the satisfaction of the sentencing court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the sentencing court may remit all or part of the amount due in costs, or modify the method of payment under RCW 10.01.170.

RCW 9.94A.760

(1) Whenever a person is convicted in superior court, the court may order the payment of a legal financial obligation as part of the sentence. The court must on either the judgment and sentence or on a subsequent order to pay, designate the total amount of a legal financial obligation and segregate this amount among the separate assessments made for restitution, costs, fines, and other assessments required by law. On the same order, the court is also to set a sum that the offender is required to pay on a monthly basis towards satisfying the legal financial obligation. . .
. . . .

(4) All other legal financial obligations for an offense . . . may be enforced at any time the offender remains under the court's jurisdiction. [T]he court shall retain jurisdiction over the offender, for purposes of the offender's compliance with payment of the legal financial obligations, until the obligation is completely satisfied, regardless of the statutory maximum for the crime. . . The county clerk is authorized to collect unpaid legal financial obligations at any time the offender remains under the jurisdiction of the court for purposes of his or her legal financial obligations.

(7) . . .

(b) . . . During the period of repayment, the county clerk may require the offender to report to the clerk for the purpose of reviewing the appropriateness of the collection schedule for the legal financial obligation. During this reporting, the offender is required under oath to respond truthfully and honestly to all questions concerning earning capabilities and the location and nature of all property or financial assets. The offender shall bring all documents requested by the county clerk in order to prepare the collection schedule.
. . . .

(10) The requirement that the offender pay a monthly sum towards a legal financial obligation constitutes a condition or requirement of a sentence and the offender is subject to the penalties for noncompliance as provided in RCW 9.94B.040, 9.94A.737, or 9.94A.740.
. . . .

(13) The county clerk may access the records of the employment security department for the purposes of verifying employment or income, seeking any assignment of wages, or performing other duties necessary to the collection of an offender's legal financial obligations.

RCW 9.94B.040

(1) If an offender violates any condition or requirement of a sentence, the court may modify its order of judgment and sentence and impose further punishment in accordance with this section.

. . . .

(3) If an offender fails to comply with any of the requirements or conditions of a sentence the following provisions apply:

. . . .

(b) . . . [U]pon the motion of the state, or upon its own motion, [the court] shall require the offender to show cause why the offender should not be punished for the noncompliance. The court may issue a summons or a warrant of arrest for the offender's appearance;

(c) The state has the burden of showing noncompliance by a preponderance of the evidence. If the court finds that the violation has occurred, it may order the offender to be confined for a period not to exceed sixty days for each violation, and may (i) convert a term of partial confinement to total confinement, (ii) convert community restitution obligation to total or partial confinement, (iii) convert monetary obligations, except restitution and the crime victim penalty assessment, to community restitution hours at the rate of the state minimum wage as established in RCW 49.46.020 for each hour of community restitution, or (iv) order one or more of the penalties authorized in (a)(i) of this subsection. Any time served in confinement awaiting a hearing on noncompliance shall be credited against any confinement order by the court;

(d) If the court finds that the violation was not willful, the court may modify its previous order regarding payment of legal financial obligations and regarding community restitution obligations.

No. 33032-0-III

KORSMO, J. (dissenting) — Although we are reviewing a contempt ruling, the majority reverses the trial court's decision due to an alleged failure to hold a remission hearing. This is very curious to me since Mr. Sorrell established that he does have a future ability to pay his legal financial obligations (LFOs), a fact that also defeats his remission request. It appears that the majority, unlike the trial judge who actually listened to Mr. Sorrell and was in the better position to judge his sincerity than this court, believes Mr. Sorrell will never have the ability to pay. Since the trial court concluded otherwise, and the record supports the trial judge's decision, I dissent.

There is no doubt that Mr. Sorrell is in a difficult financial position, largely of his own making, and that in part the obligations owed to his child and to the court system put additional financial pressure on him. He currently is indigent. But that fact is only the starting point for analysis, rather than the endpoint.

The constitution does not limit the ability of the states to impose financial obligations on convicted offenders. It only prohibits the enforced collection of financial

obligations from those who cannot pay them. *Fuller v. Oregon*, 417 U.S. 40, 92 S. Ct. 2116, 40 L. Ed. 2d 642 (1974); *State v. Blank*, 131 Wn.2d 230, 237-38, 930 P.2d 1213 (1997); *State v. Curry*, 118 Wn.2d 911, 915-16, 829 P.2d 166 (1992); *State v. Barklind*, 87 Wn.2d 814, 817-18, 557 P.2d 314 (1976). Accordingly, remission motions require that the court adjudge the offender's current or future ability to pay those costs. *Blank*, 131 Wn.2d at 242. However, punishment for failure to pay can only be imposed if the refusal is willful. *Id*. at 241-42. In addition, Washington has long directed trial judges to consider a defendant's ability to pay prior to imposing *discretionary* court costs at sentencing. RCW 10.01.160(3). However, ability to pay need not be considered when imposing mandatory costs and need only be considered at the time of collection. *State v. Lundy*, 176 Wn. App. 96, 102-09, 308 P.3d 755 (2013). The same rule applies to appellate costs. *Blank*, 131 Wn.2d at 242.

*State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), did not change, nor could it change, constitutional standards or legislative policy. Two significant legal principles came out of *Blazina*. First, trial judges were reminded of their *statutory* obligation to consider RCW 10.01.160(3) before imposing discretionary LFOs and were given guidelines to consider while performing that task. 182 Wn.2d at 837-39. Second,

2

appellate courts were granted discretionary authority to decide whether or not to consider

LFO arguments that were not raised in the trial courts. *Id*. at 832-35.[1]

In my personal opinion, the primary function of *Blazina* was to add our court's

voice to the national discussion of the problem that financial debt causes to convicted

offenders as one of the primary barriers to reintegration into society. *Id*. at 835-36. The

opinion also served to raise these important issues with our state legislature, although that

body has not yet seen fit to grant any significant relief. How that impulse will play out in

the future is unknown. However, the imposition of user fees on those haled into the

criminal justice system is consistent with our state's long held policies concerning taxes

and fees in other arenas. Nearly every profession in this state is subject to licensing fees

and many are also subject to additional fees for regulatory expenses.[2] *See generally* Title

---

[1] In this regard, *Blazina* expanded the court's common law "sentencing error" exception to the principle, currently found in RAP 2.5(a), that most arguments not presented in the trial court will not be considered on appeal. *State v. Ford*, 137 Wn.2d 472, 973 P.2d 452 (1999); *State v. McCorkle*, 137 Wn.2d 490, 973 P.2d 461 (1999); *State v. Moen*, 129 Wn.2d 535, 543-48, 919 P.2d 69 (1996); *In re McNutt v. Delmore*, 47 Wn.2d 563, 565, 288 P.2d 848 (1955). Although this approach can be utilized effectively when the factual record is sufficiently developed to permit full and fair consideration of the issue, that is typically not the case in situations, such as imposition of LFOs, that are heavily dependent on the factual circumstances of the case.

[2] Indeed, the Washington Supreme Court applies a similar fee based system to lawyers practicing in this state. *E.g.*, *Graham v. Bar Association*, 86 Wn.2d 624, 626-30, 548 P.2d 310 (1976); ch. 2.48 RCW.

18 RCW. Similarly, everyone who owns an automobile pays for the privilege, being required to have a driver's license and to register the vehicle. Anyone who drives a vehicle pays some of the highest gasoline taxes in the country to maintain our state highway system. Numerous other examples abound. The progressive impulses that motivated our state's constitutional convention did not anticipate an income tax nor permit progressive taxation.[3] *E.g.*, *Power, Inc. v. Huntley*, 39 Wn.2d 191, 204, 235 P.2d 173 (1951) (again rejecting idea of state income tax). Thus, we have a system whereby those who force the expenditure of criminal justice resources are expected to pay something to maintain the cost of that system. While that is less than ideal for many reasons,[4] it is the normative condition in this state.

These observations are of importance because courts have no criminal sentencing authority that has not been granted by the legislature. *State v. Pillatos*, 159 Wn.2d 459, 469, 150 P.3d 1130 (2007) (no authority for courts to adopt sentencing procedure necessary to comply with United States Supreme Court mandate); *State v. Ammons*, 105 Wn.2d 175, 180, 713 P.2d 719, 718 P.2d 796 (1986) (legislature has plenary authority

---

[3] Nor did those who drafted our constitution foresee how the limited taxing abilities of our counties and cities would seriously hamper the financing of local criminal justice systems that typically account for well more than half of the budget of most governments.

[4] It is unrealistic to expect the poor to be able to pay for the system that punishes them and, too often, also serves to perpetuate poverty.

over setting punishments).[5]  If the legislature ultimately is convinced that mandatory

court costs do more harm than good, it undoubtedly will change its views on these

matters.  However, restitution has long been considered a rehabilitative tool rather than a

punitive one.[6]  In accordance with that view, the legislature also is quite free to conclude,

as it apparently has, that proper reintegration into society should include at least some

efforts to make financial amends to the victims of a defendant's behavior.  That

deliberative body is also quite free to reason along the same lines with respect to some of

the costs that a criminal offense imposes on society and expect the offender to make good

efforts at paying back some of those costs.  If a court does not agree with the

consequences of legislative policy, the best (and only) way to address the problem is to

ask that body to change its policy through additional legislation.

---

[5] "This argument fails to recognize that the trial court does not have absolute discretion to do whatever it pleases.  The trial court's discretion in sentencing is that which is given by the Legislature." *Ammons*, 105 Wn.2d at 181 (rejecting argument that SRA violates judicial authority).  That principle extends to the early days of our statehood: "The spirit of the law is in keeping with the acknowledged power of the legislature to provide a minimum and maximum term within which the trial court may exercise its discretion in fixing sentence, taking into consideration, as it should always, the character of the person as well as the probability of reformation; or the legislature may take away all discretion and fix a penalty absolute, as it does in many instances." *State v. Le Pitre*, 54 Wash. 166, 169, 103 P. 27 (1909).

[6] "Restitution, as a condition of probation, is primarily a rehabilitative tool. . . . Though partial compensation may be a concomitant result of restitution, it is not the primary purpose of such an order." *State v. Barr*, 99 Wn.2d 75, 79, 658 P.2d 1247 (1983).

Rather than bow to that policy, the majority seeks to find an escape hatch in *Blazina* and *City of Richland v. Wakefield*, 186 Wn.2d 596, 380 P.3d 459 (2016). However, those cases provide no exit. *Blazina* involves a matter of statutory interpretation concerning the initial decision to impose discretionary LFOs. *Wakefield* simply recognizes that the federal anti-attachment statute prevents states from seeking the proceeds of disability payments. *Id*. at 607-09. A person whose sole income is non-attachable federal disability payments does establish future inability to pay; hence, there is no expectation that the defendant will ever be able to pay the discretionary LFOs and they must be remitted. *Id*. at 610-11.

Neither *Blazina* nor *Wakefield* created a new standard for resolving remission motions. Indeed, *Wakefield* expressly recites the constitutional standard relevant to such motions: "If a person has no present or future ability to pay amounts that will actually pay off their LFOs, remission in accordance with RCW 10.01.160(4) is a more appropriate and just option." *Id*. at 607. As noted previously, this is the same standard long recognized for remission issues. *Fuller*, 417 U.S. 40; *Blank*, 131 Wn.2d at 237-38; *Curry*, 118 Wn.2d at 915-16; *Barklind*, 87 Wn.2d at 817-18. While undoubtedly *Wakefield* and *Blazina* inform trial court decisions on what both indigency and undue hardship mean, they simply have not altered the ultimate test dictated by the constitution that the trial courts must apply—does defendant have the current or future ability to pay the LFOs?

6

The trial court correctly considered the defendant's ability to pay when adjudging his financial situation. The facts stated by the majority from this case record demonstrated, at a minimum, that Mr. Sorrell certainly had the ability to pay his LFOs in the future. He was employed.[7] He was paying at least $500 per month toward his child support obligations. He managed to come up with an additional $1,000 to pay medical bills. According to his testimony, his child support obligations were to end in 2016. Thus, by now Mr. Sorrell should have no difficulty paying a significant amount toward his LFOs. Throughout this period of litigation, Mr. Sorrell has continuously demonstrated his ability to earn a living and pay down his obligations. By operation of the garnishment, his child support obligation had the highest priority and arguably left him unable to also make payments on his LFOs, but that was a question for the trial court to resolve. The record reflects that Mr. Sorrell had at least a future ability to pay given that he was employed and that his support obligation would soon be ending. Understandably, the trial court had no reason to remit the LFOs.

---

[7] The nature of his employment apparently horrifies the majority, as they mention it at least three times in their opinion. However, that line of work has no bearing on any issue before the trial court or this court other than to demonstrate that he is employed and earning money. Since he was not using any of those proceeds to pay his LFOs, the LFO obligation cannot be blamed for the work he was doing.

7

The majority's decision to even discuss the remission motion in this appeal from a contempt sanction also is curious for several reasons. First, the issue is not one from which an appeal can even be taken. *State v. Smits*, 152 Wn. App. 514, 523-24, 216 P.3d 1097 (2009); *accord State v. Shirts*, 195 Wn. App. 849, 854, 381 P.3d 1223 (2016) (granting discretionary review of remission ruling). Second, even if we felt the need to grant discretionary review of this issue, it is moot in this case since the majority is already reversing the contempt ruling. Third, the question to be answered at the new contempt hearing is whether or not Mr. Sorrell's refusal to pay is willful. The question at a remission hearing will be whether he has the future inability to pay. Both issues turn on the same factual point—can he (or could he previously) pay his obligations? The defendant's own evidence has demonstrated that he does have the ability to earn a living and pay his obligations. His motion is lost before it is even reargued. Finally, the filing of a remission motion does not mandate an evidentiary hearing; that is a decision for the trial court to make. *Shirts*, 195 Wn. App. at 860-61.[8]

Although the analysis should end at this point, the decision to remand requires brief discussion of a few more items. For one, credibility matters in these types of issues and I feel that the majority is unduly crediting Mr. Sorrell and his evidence where it is

---

[8] There are many cases, and this appears to be one of them, that demonstrate the wisdom of not acting immediately on every request and, instead, giving the defendant time to demonstrate whether he will have the future ability to pay.

apparent to me that the trial court did not. While the majority views Mr. Sorrell as the

victim of a heartless system bent on crushing him under needless financial obligations, I

would suggest that view is not compelled by the evidence—even if it were our job to

make that determination. It is quite possible to view Mr. Sorrell as a recalcitrant game

player who is determined to fight back against his remaining obligations. According to

the majority's own statement of the record, nearly the first thing out of his mouth at the

2013 hearing was a request to waive his LFOs even though he was just recently released

from prison and still seeking work. He followed that up with an expression of hope that

he would be able to get rid of his obligation to his "ex." Rather than suggest an inability

to pay these obligations, his statements suggest that his motivation simply was to avoid

all of his obligations. The fact that he later was able to deal with unexpected medical

expenses also suggests that perhaps his lifestyle was not as financially tight as he wanted

the trial court to believe and that there were at least a few dollars available to him that

might have been turned over to the court system. Whether that is true or not is a matter

for the trial court to decide, not this court.[9]

---

[9] These are difficult matters for trial courts to resolve since the primary source of financial information is the offender who has every incentive to overstate costs and understate resources. There probably is need for uniform financial reporting forms that would assist busy trial judges as well as provide a template for those making good faith remission arguments.

Just as appellate courts do not decide these issues, neither should we send cases back for reconsideration where the trial court has applied the correct standards. Since Mr. Sorrell has a demonstrated ability to pay his debts, the trial court did not err in concluding that he will be able to do so. No matter how much the majority wants to find Mr. Sorrell unable to pay his debts, it is not the job of this court to do so. Thus, I commend to appellate judges the serenity prayer:

> God, grant me the serenity to accept the things I cannot change,
> Courage to change the things I can,
> And wisdom to know the difference.[10]

The legislature will change our LFO standards if and when it wants to. Trial judges will interpret the facts as they see fit, not as we want them to do. Thus, we have to accept the laws the way they are written and the facts as they are found.

I believe the rulings should be affirmed.

_____
Korsmo, J.

---

[10] Attributed to theologian and philosopher Reinhold Niebuhr (1892-1971). *See* Laurie Goodstein, *Serenity Prayer Skeptic Now Credits Niebuhr*, N.Y. TIMES (Nov. 27, 2009), http://www.nytimes.com/2009/11/28/us/28prayer.html.